KELLY, J.
(dissenting). We granted leave to appeal in this case to determine (1) whether the Attorney Discipline Board (ADB) can answer constitutional questions, *348 (2) whether comments made by respondent concerning three Court of Appeals judges during a radio broadcast violated certain of the Michigan Rules of Professional Conduct (MRPC), and (3) whether those rules violate the freedoms provided by the First Amendment of the United States Constitution or article 1, § 5 of our state constitution. US Const, Am I; Const 1963, art 1, § 5.
I agree with the majority of the ADB that the ADB has the authority to decide constitutional questions because, inherently, this Court has delegated that authority to it. I would hold, also, that respondent did not violate MRPC 3.5(c) or 6.5(a) because his statements were proscribed by neither rule. And, even if respondent had violated either rule, the rules are unconstitutionally vague and infringe on respondent’s free speech protected by the First Amendment of the federal constitution.
THE ADB CAN DECIDE CONSTITUTIONAL QUESTIONS
The issues presented in this case are questions of law involving attorney discipline, which we review de novo. Grievance Administrator v Lopatin, 462 Mich 235, 247; 612 NW2d 120 (2000). Our responsibility to regulate and discipline members of the State Bar of Michigan is found in our state constitution at Const 1963, art 6, § 5,[1] and in our statutes at MCL 600.904.[2] To fulfill this responsibility, we created by court rule the Attorney *349 Grievance Commission and the Attorney Disciplinary Board. MCR 9.108[3] and MCR 9.110.[4] Through these rules, we have delegated the initial phases of our *350 constitutional responsibility to supervise and discipline Michigan attorneys. Just as no one contests that the Court has the power to hear constitutional questions, no one cites authority that limits the Court’s power to delegate this power to the ADB.
The majority holds that the ADB cannot answer constitutional questions because of its mere quasi-judicial status. It bases that decision on Wikman v Novi,[5] Lewis v Michigan,[6] and Const 1963, art 3, § 2. But, none of these authorities answers the question. Neither Wikman nor Lewis involved a delegation of judicial power to a judicially created entity. Wikman dealt with a legislative delegation of power to the Michigan Tax Tribunal. Lewis dealt with the constitutional power of the Legislature to implement equal *351 protection provisions.[7] Article 3, § 2 of the state constitution is the Separation of Powers Clause.[8]
Lewis had nothing to do with the delegation of authority to decide constitutional questions. Wikman discussed the authority of the Legislature to delegate to one of its agencies the power to determine a constitutional question. It inferred that the Legislature cannot make this delegation because the authority to answer a constitutional question resides in the judiciál branch.
By contrast, this case involves the power of the Supreme Court to delegate authority to opine on a constitutional question to one of its own agencies. It does not follow that, because a legislatively created quasi-judicial agency may not decide a constitutional question, a quasi-judicial agency of the Supreme Court cannot do so. Rather, the opposite result should obtain. If this Court makes a broad delegation of authority to its own quasi-judicial agency and does not expressly exempt from it the determination of constitutional questions, the agency has that power.
There being no restriction on the Court’s power to delegate constitutional power and none on the ADB’s delegated authority, I would hold that the ADB may answer constitutional questions involving attorney discipline.
*352 RESPONDENT DID NOT VIOLATE MRPC 3.5(c)
A. PENDING CASES
MRPC 3.5(c) reads: “A lawyer shall not. . . engage in undignified or discourteous conduct toward the tribunal.”
In order to determine whether respondent violated MRPC 3.5(c), it is necessary first to address whether statements were made during a “pending” case. Respondent’s statements were uttered after the Court of Appeals opinion in the underlying case had been issued and before any party made a motion for reconsideration or appealed.
The word “pending” is not defined by the Michigan Court Rules. Therefore, it is appropriate to consult other sources to verify the word’s ordinary meaning. MCL 8.3a. Black’s Law Dictionary (8th ed) defines “pending” as “ [remaining undecided; awaiting decision <a pending ease>.” Random House Webster’s College Dictionary similarly provides that “pending” means “awaiting decision or settlement.” Applying these definitions, I find no support for a finding that respondent’s statements were made during a pending case. Nothing remained undecided at the time the statements were made.
The majority also uses a legal dictionary. Applying it to several court rules, the majority concludes that the Court of Appeals opinion was still pending because it was not effective at the time respondent made his comments. The majority states that MCR 7.215(F)(1)(a) and MCR 7.302(C)(2)(a) and (b) show that Court of Appeals opinions do not become effective until (1) after expiration of the time for filing an application for leave to appeal to this Court or (2) until this Court decides the case, if leave is granted. However, the date when a *353 Court of Appeals decision becomes “effective” is not the same as the date when a matter is no longer “pending” before that Court.
When respondent made his statements, there were no issues unresolved or motions left to be decided. Although the opinion was not yet final, it had been released and nothing remained to be done by the Court of Appeals; nothing was “pending.” The majority’s analysis does not apply the common meaning of “pending.” Instead, it creates a world where cases theoretically can be pending for an indeterminate length of time.[9]
In light of the above, I am not persuaded by the majority’s analysis. Rather, I find that the underlying case was not “pending” at the time respondent made his comments.
B. IN-COURT STATEMENTS
MRPC 3.5(c) provides that a lawyer shall not engage in undignified or discourteous conduct toward the tribunal. The “Comments” on the rule, while not binding, are persuasive in determining its meaning and reflect the thoughts of this Court on the rule’s true meaning. The comments on MRPC 3.5 provide, in relevant part:
The advocate’s function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate’s right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, *354 but should avoid reciprocation; the judge’s default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.
When subsection c is read in the context of the entire rule and the comment, its intent becomes apparent. It is aimed at prohibiting conduct that is directed “toward the tribunal” only during oral argument or trial. Everything in the comment refers to activity that transpires in a courtroom. The comment is quiet about an attorney’s conduct anywhere else or after a proceeding is no longer pending.
When interpreting MRPC 3.5(c), it is instructive to look at the American Bar Association’s (ABA) Model Rules of Professional Conduct 3.5. It provides that “[a] lawyer shall not. . . (d) engage in conduct intended to disrupt a tribunal.” MRPC 3.5(c) was fashioned from ABA Model Rule 3.5. Also, the ABA’s former DR 7-106(C)(6) and our former DR 7-106(c)(6) were identical. DR 7-106 is another source of MRPC 3.5(c). It stated, “In appearing in his professional capacity before a tribunal, a lawyer shall not. .. engage in undignified or discourteous conduct which is degrading to a tribunal.” DR 7-106(c)(6)(e).
As ADB members Theodore J. St. Antoine, William P Hampton, and George H. Lennon noted in their opinion in this case:
In terms of the structure of Rule 3.5 versus the comparable Code provision, we note that the former Code’s DR 7-106 dealt entirely with “Trial Conduct,” and subparagraph (C) contained seven prohibitions applicable when a lawyer was “appearing in his professional capacity before a tribunal.” Michigan and Model Rules 3.5 involve not only rules regarding conduct during a proceeding, but also rules *355 which had previously been located elsewhere in the Code, such as prohibitions against influencing judges and other officials. Thus, the introductory paragraph of Rule 3.5 reflects a different, broader, scope than that of the comparable Code provision. That is, instead of saying (as the Code did), “In appearing in his professional capacity before a tribunal, a lawyer shall not...,” MRPC 3.5 says simply, “A lawyer shall not.. ..” The ABA focused Model Rule 3.5(c) on conduct related to pending proceedings by prohibiting “conduct intended to disrupt a tribunal.” Michigan’s Rule, as we have mentioned, is different. Although Michigan largely adopted the ABA Model Rules, the text of MRPC 3.5(c) was modified so that it proscribes “undignified or discourteous conduct toward the tribunal.” [Emphasis in original.]
As these members of the ADB properly explained, MRPC 3.5(c) eliminated the inquiry into the lawyer’s intent, choosing instead to focus on whether the conduct was (1) undignified or discourteous, and (2) “conduct toward the tribunal.” Because respondent concedes, and I agree, that his statements were disrespectful and discourteous, the issue becomes whether the conduct was “toward the tribunal.”
Respondent made the statements on a radio program. He did not make them in a court of law. I would limit MRPC 3.5(c) to statements and conduct that take place in a courtroom. Accordingly, I would find that respondent did not violate MRPC 3.5(c) because the conduct in question was not “toward a tribunal” as envisioned by the rule.
I am unpersuaded by the majority’s conclusion that limiting the rule’s application to a courtroom would make it superfluous in light of the contempt powers of courts. MCL 600.1711(1). Rather, MRPC 3.5(c) provides an alternative to the power of the court to find an attorney in contempt. There are situations where a *356 reprimand or other discipline not involving a contempt of court citation is appropriate. MRPC 3.5(c) expands a judge’s range of options.
I also disagree with the majority that a construction of MRPC 3.5(c) that limits its application to courtrooms “fails to accord consideration to the importance the courtesy and civility rules serve as a vehicle for preserving the public’s confidence in the integrity of the legal process.” Ante at 252. Confidence in our courts is best served when an attorney is free to comment on what the attorney perceives as the deficiencies of our judges and of our legal system. Extending the rule beyond the courtroom necessarily chills comment.
I would read MRPC 3.5(c) together with its comment and hold that it applies only to statements and conduct in a courtroom. Therefore, I would find that respondent did not violate the rule.
RESPONDENT DID NOT VIOLATE MRPC 6.5(a)
MRPC 6.5(a) reads:
A lawyer shall treat with courtesy and respect all persons involved in the legal process. A lawyer shall take particular care to avoid treating such a person discourteously or disrespectfully because of the person’s race, gender, or other protected personal characteristic. To the extent possible, a lawyer shall require subordinate lawyers and nonlawyer assistants to provide such courteous and respectful treatment.
Respondent argues that MRPC 6.5(a) does not apply to the statements complained of in this case. This rule provides that “[a] lawyer shall treat with courtesy and respect all persons involved in the legal process.” The comments on the rule provide in part:
*357 A lawyer is an officer of the court who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly. It is increased when the obligation is met.
A lawyer must pursue a client’s interests with diligence. This often requires the lawyer to frame questions and statements in bold and direct terms. The obligation to treat persons with courtesy and respect is not inconsistent with the lawyer’s right, where appropriate, to speak and write bluntly. Obviously, it is not possible to formulate a rule that will clearly divide what is properly challenging from what is impermissibly rude. A lawyer’s professional judgment must be employed here with care and discretion.
When read in conjunction with the comments, the rule reveals an underlying intent that lawyers display civility towards parties, witnesses, and third parties involved in the legal process. Because the rule focuses on the legal process, its application should be to pending litigation or other pending “legal matters.” To read it otherwise would be to extend its application beyond any identifiable time limit. An attorney could be subject to sanctions under the rule years after a legal matter was no longer pending. I agree with the reasoning of ADB members St. Antoine, Hampton, and Lennon that “[n]othing in Rule 6.5 suggests that ‘persons involved in the legal process’ may not ever be criticized for their role in that process, not even after the involvement has ceased.”
As explained above, respondent’s comments were not made while the case was pending. The Court of Appeals had decided the matter, and no postjudgment motions *358 or appeals had been filed. Therefore, I would find that respondent’s conduct did not violate MRPC 6.5(a) because the rule is not intended to apply to comments made about the participants in a legal action when the matter is not pending.
MRPC 3.5(c) AND 6.5(a) ARE UNCONSTITUTIONAL
Respondent argues that, if his words did violate MRPC 3.5(c) and 6.5(a), the rules are unconstitutionally vague and violate his right to free speech under both the Michigan Constitution and the First Amendment to the federal constitution.
A. VAGUENESS
Due process requires that an enactment be held void for vagueness if it is worded so that someone of ordinary intelligence cannot readily identify what does and does not violate the law. United Food & Commercial Workers Union, Local 1099 v Southwest Ohio Regional Transit Auth, 163 F3d 341, 358-359 (CA 6, 1998); Grayned v City of Rockford, 408 US 104, 108; 92 S Ct 2294; 33 L Ed 2d 222 (1972). Vague laws not only trap innocent persons, they “impermissibly delegateD basic policy matters to policemen, judges, and juries for resolution on an aci hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.” United Food, supra at 359, quoting Grayned, supra at 108-109. The United States Supreme Court has determined that
[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague *359 laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. [Grayned, supra at 108.]
Moreover, the absence of clear standards invites abuse by enabling an official to use impermissible facts to administer the policy. United Food, supra at 359. The danger of “abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum’s use.” Southeastern Promotions, Ltd v Conrad, 420 US 546, 553; 95 S Ct 1239; 43 L Ed 2d 448 (1975). The vagueness doctrine mandates that the limits that the government claims are implicit in a law “be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice.” City of Lakewood v Plain Dealer Publishing Co, 486 US 750, 770; 108 S Ct 2138; 100 L Ed 2d 771 (1988).
The United States Supreme Court has informed us that
[t]he [vagueness] doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent “arbitrary and discriminatory enforcement.” Where a statute’s literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts. [Smith v Goguen, 415 US 566, 572-573; 94 S Ct 1242; 39 L Ed 2d 605 (1974).]
But, an ethical rule that would normally be void for vagueness will escape invalidation if a state court has offered a clarifying interpretation explaining what conduct the rule encompasses. See Gentile v State Bar of Nevada, 501 US 1030, 1048; 111 S Ct 2720; 115 L Ed 2d 888 (1991).
*360 Therefore, an enactment violates the First Amendment when it does not provide fair notice of what conduct will violate the law[10] or when it gives a public official “ ‘unbridled discretion’ such that the official’s decision to limit speech is not constrained by objective criteria, but may rest on ‘ambiguous and subjective reasons.’ ” United Food, supra at 359, quoting Desert Outdoor Advertising, Inc v City of Moreno Valley, 103 F3d 814, 818 (CA 9, 1996).[11]
Normally one whose conduct clearly violates the law may not challenge the law for vagueness. However, a challenge may be brought when First Amendment rights are implicated. United States v Mazurie, 419 US 544, 550; 95 S Ct 710; 42 L Ed 2d 706 (1975). See also United States v Powell, 423 US 87, 92-93; 96 S Ct 316; 46 L Ed 2d 228 (1975); United States v Nat’l Dairy Products Corp, 372 US 29, 32-33, 36; 83 S Ct 594; 9 L Ed 2d 561 (1963). The rules at issue here impede the First Amendment right to free speech. Hence, respondent properly asserts his vagueness claims.
When assessing the merits of respondent’s claim, it is important once again to consider the language of MRPC 3.5(c) and 6.5(a). MRPC 3.5(c) proscribes attorneys from engaging in conduct that is either undignified or discourteous. These words do not provide adequate notice to attorneys to explain in all situations what conduct will violate the rule. It is undignified to use slurred speech or to wear a filthy coat. It is also disrespectful to use foul language or to make an obscene *361 gesture to a judge. There are numerous examples of conduct that could arguably violate the rule. A person of ordinary intelligence cannot readily identify which violate the rule and which do not. Not only are the parameters of the rule undefined, the ambiguity of the rule permits the possibility of selective or discriminatory enforcement.[12]
The majority’s inclusion in the rule of statements and conduct that take place outside a courtroom significantly enhances the rule’s vagueness. This is because the rule, so interpreted, sets no limits on when or where an attorney is free to speak his or her mind to another person. Arguably, under the majority’s interpretation, no time, place, or medium is safe because any unprivileged, discourteous observation about a judge communicated to another person could lead to sanctions. The possibility of selective or discriminatory enforcement occurring is enhanced when an attorney represents unpopular clients or presents controversial issues. Therefore, the rule must fall to the First Amendment.
MRPC 6.5(a) suffers from a similar lack of clarity. It requires an attorney to treat all persons “involved in the legal process” with “courtesy and respect.” Any number of actions or inactions could violate this rule. Ultimately, the rule’s ambiguity and uncertainty condemn it.
*362 The majority argues that we should not expect that the rule’s parameters could be defined with “ ‘mathematical certainty.’ ” Ante at 255 (citation omitted). But this approach begs the questions whether there are parameters and what they are. Instead of offering answers, the majority merely states its belief that MRPC 3.5(c) and 6.5(a) do not violate the constitution. The absence of analysis for this conclusion suggests that it has no basis in the law.
I agree with the majority that there should be flexibility in our ethical rules, but I maintain that the flexibility should not stretch beyond our basic constitutional rights. Unfortunately, MRPC 3.5(c) and 6.5(a) have no conceivable parameters, and this Court has provided no guidance that would save them from constitutional invalidation. As they stand, these rules leave ordinary persons vulnerable to possible discipline and sanction without proper constitutional safeguards.
These rules do not permit persons of ordinary intelligence to readily identify the applicable standard for their conduct. They allow for the strong possibility of discriminatory enforcement. Accordingly, I would find them unconstitutionally vague.
B. FREEDOM OF SPEECH
Respondent also argues that, if the rules are not unconstitutionally vague, they are an unconstitutional abridgement of his right to free speech. His argument is based on the premise that his comments were political, rhetorical hyperbole and satire protected by the First Amendment.
The initial step in a First Amendment analysis is to determine whether the comments under consideration constitute protected speech. The Grievance Administrator argues that the respondent’s statements are not *363 protected because they were a resort to epithets or personal abuse. Essentially his argument is that respondent’s comments are not protected because they are offensive.
It is true that the United States Supreme Court has stated that “ ‘[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.’ ” Chaplinsky v New Hampshire, 315 US 568, 572; 62 S Ct 766; 86 L Ed 1031 (1942), quoting Cantwell v Connecticut, 310 US 296, 309-310; 60 S Ct 900; 84 L Ed 1213 (1940). Chaplinsky concerned a New Hampshire statute that provided:
“No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation.” [Chaplinsky, supra at 569.]
The Court’s opinion was based on the belief that Chaplinsky’s statements were “fighting words.” As the Court stated, “fighting words” are “those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.” Id. at 572. In fact, the Court does not mention political speech or hyperbole despite the fact that Chaplinsky’s statements were directed toward his local government. Id. at 569. Because the case was decided on the “fighting words” doctrine, it is of little guidance to us in deciding this case.
Moreover, Chaplinsky and Cantwell, on which Chaplinsky was based, must be considered in light of the decision 36 years later in FCC v Pacifica, 438 US 726; *364 98 S Ct 3026; 57 L Ed 2d 1073 (1978). In Pacifica, the Court addressed whether the FCC could sanction a broadcaster for speech that was not obscene but was offensive. The Court cited Chaplinsky, but stated that some words, although lacking in literary, political, or scientific value, “are not entirely outside the protection of the First Amendment.” Id. at 746.[13] The Court specified that First Amendment protection would be required if what made the radio monologue offensive “could be traced to its political content....” Id.
Contrary to petitioner’s assertion, several decisions have given offensive speech First Amendment protection. One that is especially pertinent is Watts v United States, 394 US 705; 89 S Ct 1399; 22 L Ed 2d 664 (1969). There, the defendant was convicted of violating a statute that made it a criminal offense to threaten the life of the President of the United States. At an antiwar rally, the defendant stated that “ ‘[i]f they ever make me carry a rifle the first man I want in my sights is L.B.J. [Lyndon Baines Johnson]’ ” Id. at 706. The defendant argued that the statement was political opposition to the President. Id.
The Supreme Court reversed his conviction and held that the political hyperbole used by the defendant did not amount to a violation of the statute. In reaching its decision, the Court stated:
[W]e must interpret the language Congress chose “against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly *365 sharp attacks on government and public officials.” New York Times Co. v. Sullivan, 376 U.S. 254, 270 [84 S Ct 710; 11 L Ed 2d 686] (1964). The language of the political arena, like the language used in labor disputes, see Linn v United Plant Guard Workers of America, 383 U.S. 53, 58 [86 S Ct 657; 15 L Ed 2d 582] (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was “a kind of very crude offensive method of stating a political opposition to the President.” Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise. [Id. at 708.]
In the instant case, respondent is situated similarly to the defendant in Watts. He made offensive and crude comments about three Court of Appeals judges to show his opposition to their decision in a court case. Just as in Watts, when taken in context, respondent’s statements were, in essence, satire, and hyperbole. In fact, respondent’s statements declaring war on the judges and suggesting that they be sodomized were less troublesome than the defendant’s statement in Watts suggesting that he would shoot the President.
This Court has expressly recognized that political hyperbole, parody, and vigorous epithets are permissible in the course of a judicial campaign. In re Chmura (After Remand), 464 Mich 58; 626 NW2d 876 (2001) (Chmura II). The majority argues that Chmura II does not apply to respondent because respondent’s statements were not made in a political context. The majority also notes that no campaign was under way at the time respondent made his statements. Ante at 256. But the decisions in cases such as Cohen and Watts illustrate that “political speech” is not as neatly defined as the majority would like to believe. The incidents in Cohen and Watts did not occur during a political campaign.
*366 I do not agree with the majority’s narrow interpretation of “political speech,” nor do I believe that political hyperbole and satire should be limited to a campaign setting. Respondent’s comments were about three public figures concerning their character and the manner in which they perform their public duties.[14] While it is without doubt that respondent’s comments were crude, it is inescapable that they were political.
The majority also argues that the statements were made during a pending case, subjecting them to less constitutional protection. As I have explained, I disagree with the majority’s conclusion that the comments were made during a “pending” case. While situations exist when a court may constitutionally limit an attorney’s speech, the facts of this case do not fall into that line of cases for several reasons. Even if I were to apply the lower standard the majority adopts, I would find that MRCP 3.5(c) and 6.5(a) unconstitutionally abridge the right to freedom of speech.
In Gentile v State Bar of Nevada,[15] the United States Supreme Court granted certiorari to determine whether Nevada Supreme Court Rule 177, governing pretrial publicity, violated the First Amendment. The Court addressed whether attorneys may be subject to greater restrictions on their speech during a pending case. It held:
It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to “free speech” an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial *367 court beyond the point necessary to preserve a claim for appeal. Sacher v. United States, 343 U.S. 1, 8 [72 S Ct 451; 96 L Ed 717] (1952) (criminal trial); Fisher v. Pace, 336 U.S. 155 [69 S Ct 425; 93 L Ed 569] (1949) (civil trial). Even outside the courtroom, a majority of the Court in two separate opinions in the case of In re Sawyer, 360 U.S. 622 [79 S Ct 1376; 3 L Ed 2d 1473] (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. There, the Court had before it an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. [Gentile, supra at 1071.]
Using these standards, the Court adopted a balancing test. Under the test, a court must weigh the state’s interests underlying the ethical rule at issue and the attorney’s First Amendment rights. The Court also held that the rule must be narrowly tailored to meet the state’s interest.[16] Id. at 1076.
To fully understand the applicability of Gentile and Sawyer to this case, it is essential to look at their facts. As stated above, Gentile concerned pretrial publicity. Sawyer concerned comments made during a pending trial. It is noteworthy that neither case is directly on point. Sawyer concerned comments made by an attorney about a judge, but the attorney’s actions took place while a trial was pending. In fact, in Gentile the Court upheld the rule because “it merely postpone[d] the attorneys’ comments until after the trial.” Id. (emphasis added). Neither case is applicable here, because respondent’s statements were made after his client’s case had been decided in the Court of Appeals and no trial or other legal proceeding was pending.
*368 By deciding that respondent’s statements are subject to less First Amendment protection because they were made during a pending matter, the majority stretches the holdings in Gentile and Sawyer. I cannot join in that distortion.
Attorneys must be free to speak about a case after it has been decided. Stifling speech while memories of the case are freshest is a disservice to the parties as well as to the public. Because of the majority’s extension of Gentile, it could be years before an attorney could finally express his or her opinion about the judges that sat in a case. Even though the majority states that attorneys still may offer disagreement with a court decision, the ruling in this case will have a chilling effect on attorneys’ free speech.
Even if I were to apply the lower standard expressed in Gentile, I would find that MRPC 3.5(c) and MRPC 6.5(a) are unconstitutional because they are not narrowly tailored. I agree with the majority that the state’s interest in maintaining a well-respected judiciary is an important one. But whether that interest outweighs an attorney’s right to criticize a judge is not the paramount question. The rules in question cannot satisfy the third prong of Gentile because there are no reasonable and definite standards that an official can follow in applying them. Niemotko v Maryland, 340 US 268, 271; 71 S Ct 325; 95 L Ed 267 (1951).
The pretrial publicity rule in Gentile was written to apply only to speech that is substantially likely to have a materially prejudicial effect. Gentile, supra at 1076. The rules at issue here lack that narrow tailoring. They are so vague that a person of reasonable intelligence could not decipher their boundaries. Nothing limits their application. Because they are not narrowly tai *369 lored, even under Gentile, MRPC 3.5(c) and 6.5(a) must fall to the First Amendment.[17]
The majority asserts that the holdings of Cohen and Watts are inapplicable here because they involve the rights of everyday citizens, as contrasted with those of attorneys. I disagree. Cohen and Watts sought to define protected political speech. Neither limited its holding to everyday citizens or nonlawyers. Rather, both stand for general principles that outline the landscape of protected political speech. The majority’s statement that Gentile overrode Cohen and Watts on the matter of defining political speech by attorneys is inaccurate. Gentile did not define political speech for lawyers or anyone else. Rather Gentile set parameters for determining whether an ethical rule may properly abridge rights protected by the constitution.
In response to the legal analysis I have provided, the majority advances yet another parade of horribles.[18] *370 Certainly the First Amendment and the rights it embodies are too precious to jettison on the basis of hypothetical situations. I have too much faith in the quality and integrity of our judiciary and our bar to believe them unable to handle capably the great responsibilities that come with free speech. I would rather risk living in the society envisioned by the majority than in one where the mere utterance of dissatisfaction could subject an attorney to harmful sanctions.
Recently, this Court held that courts should not ascribe meaning to statutes unintended by the Legislature because they fear what will develop if they interpret the language as written. Wexford Med Group v City of Cadillac, 474 Mich 192, 220 n 10; 713 NW2d 734 (2006). I believe that the majority should apply the principle stated in Wexford here when interpreting the constitution in this case.
As I have before, I find solace now in the words of Benjamin Franklin: “Any society that would give up a little liberty to gain a little security will deserve neither and lose both.”[19] Here the majority is ready to give up liberty in the hope that some hypothetical future horror will not occur. We must not permit the rights protected by the First Amendment to be whittled away in this manner.
CONCLUSION
I would hold that the Attorney Discipline Board has the authority to declare unconstitutional a rule of professional conduct by virtue of this Court’s delegation *371 of authority to it. I would hold, also, that respondent did not violate MRPC 3.5(c) or 6.5(a) because the comments in question were not made in court or while the case was pending. Finally, I would hold that, even if respondent violated them, the rules in question are unconstitutionally vague and infringe on speech protected by the First Amendment. Therefore, I would not sanction respondent.

 Article 6, § 5 provides:
The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state. The distinctions between law and equity proceedings shall, as far as practicable, be abolished. The office of master in chancery is prohibited.

 MCL 600.904 provides:
*349 The supreme court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, the discipline, suspension, and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar.

 MCR 9.108 provides:
(A) Authority of Commission. The Attorney Grievance Commission is the prosecution arm of the Supreme Court for discharge of its constitutional responsibility to supervise and discipline Michigan attorneys.
(E) Powers and Duties. The commission has the power and duty to:
(2) supervise the investigation of attorney misconduct, including requests for investigation of and complaints against attorneys[]

 MCR 9.110 provides:
(A) Authority of Board. The Attorney Discipline Board is the adjudicative arm of the Supreme Court for discharge of its exclusive constitutional responsibility to supervise and discipline Michigan attorneys.
(E) Powers and Duties. The board has the power and duty to:
(1) appoint an attorney to serve as its general counsel and executive director;
(2) appoint hearing panels and masters;
*350 (3) assign a complaint to a hearing panel or to a master;
(4) on request of the respondent, the administrator, or the complainant, review a final order of discipline or dismissal by a hearing panel;
(5) discipline and reinstate attorneys under these rules;
(6) file with the Supreme Court clerk its orders of suspension, disbarment, and reinstatement;
(7) annually write a budget for the board and submit it to the Supreme Court for approval;
(8) report to the Supreme Court at least quarterly regarding its activities, and to submit a joint annual report with the Attorney Grievance Commission that summarizes the activities of both agencies during the past year; and
(9) submit to the Supreme Court proposed changes in these rules.

 413 Mich 617; 322 NW2d 103 (1982).

 464 Mich 781; 629 NW2d 868 (2001).

 The majority correctly states that the ability to answer constitutional questions is a core judicial function. However, standing alone, the statement does not explain why this Court lacks the power to delegate its authority to a body that it created. Perhaps the majority is confusing the ability with its perception of the advisability of such a delegation.

 “The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.” Const 1963, art 3, § 2.

 Under MCR 2.612(C)(2), a motion for relief from judgment may be made “within a reasonable time” after judgment is entered. There is no other time limit on such a motion if it is not based on mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud. However, I do not believe that a case could be said to be “pending” until such time as no motion could be brought under this court rule.

 Grayned, supra at 108.

 The majority argues that MRPC 3.5(c) and MRPC 6.5(a) should not be found void for vagueness because arbitrary enforcement is possible with any professional rule or penal statute. It ignores the fact that, even if arbitrary enforcement were not an issue, the statute still violates vagueness principles because it does not provide fair warning.

 The majority argues that discriminatory enforcement is not of concern because the Attorney Grievance Commission’s actions can he reviewed on a case-by-case basis. However, the United States Supreme Court knew and considered this argument before writing its vagueness jurisprudence. It realized that every discriminatory application of the law may be correctable at some point, but the idea behind the vagueness doctrine is to prevent discriminatory enforcement in the beginning. Therefore, standing alone, this argument is insufficient to save vague rules from being found unconstitutional.

 See Cohen v California, 403 US 15; 91 S Ct 1780; 29 L Ed 2d 284 (1971), in which the defendant walked into a courthouse wearing a jacket reading “F*** the Draft.” The Supreme Court held that the words on the jacket constituted protected political speech.

 The majority stresses that respondent referred to the judges as “Hitler,” “Goebbels,” and “Eva Braun.” But, offensive though it is, reference to political figures as Nazis is a common form of political satire. See <http://semiskimmed.net/bushhitler.html> (accessed May 18, 2006).

 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991).

 The majority makes conclusory statements only. It offers a complete lack of legal analysis regarding whether the rules at issue are narrowly tailored. Merely stating that the rules are narrowly tailored does not make it so.

 The majority’s discussion of the First Amendment rights of judges is ohiter dictum. The issues in this case involve attorney speech. Whatever challenges to the Michigan Code of Judicial Conduct that may arise in the future have nothing to do with whether the comments made by respondent and complained of here are protected speech.
It should be noted, in passing, that the majority, in its joint opinion, overstates the holding in Republican Party of Minnesota v White, 536 US 765, 781-782; 122 S Ct 2528; 153 L Ed 2d 694 (2002). White does not allow judges or judicial candidates to attack a third party by name, even if the third party supports the candidate’s opponent. The holding in White is that judicial candidates may speak on disputed legal and political issues. Id. at 776-777. In fact, White implies that speech that implicates a particular person may show bias and is properly sanctioned. Id.
The majority’s treatment of White is yet another instance of the mischaracterization of case law made throughout the majority’s opinions. For a full discussion of this pattern see Justice Cavanagh’s dissent, ante at 320-325.

 This is a tired tactic. The majority has turned to such arguments in other cases in which the decision was not grounded soundly in the law. *370 See Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608, 649-650; 684 NW2d 800 (2004), and Preserve the Dunes, Inc v Dep’t of Environmental Quality, 471 Mich 508; 684 NW2d 847 (2004).

 <http://www.brainyquote.eom/quotes/authors/b/benjamin_frankhn. html> (accessed July 12, 2006).